IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

JUSTIN M. HICKOX,
    Plaintiff,
    v.                           Case No. 3:15-cv-164-KRG-KAP
PRIMECARE MEDICAL INC., et al.,
    Defendants

Report and Recommendation

Recommendation

The defendants' motion for summary judgment, ECF no. 41, should be granted, and summary judgment entered in favor of defendants on the remaining claims.

Report

Plaintiff Hickox filed a complaint in June 2015, ECF no. 2, amended a month later, ECF no. 7, alleging *inter alia* that his medical care at the Cambria County Prison was inadequate and that two members of the medical staff, defendants Harzbecker and Hewitt, retaliated against Hickox for his filing of grievances and assistance to other inmates in filing grievances. Reports and Recommendations recommending dismissal of portions of the complaint for failure to state a claim, recommending the grant in part of a motion to dismiss by defendants Harzbecker and Hewitt, and recommending partial summary judgment in favor of defendant Harzbecker are pending. See ECF no. 3, ECF no. 28, ECF no. 34.

What remains if the pending Reports and Recommendations are adopted are three claims: that defendant Harzbecker denied treatment for a spider bite in April 2015 in retaliation for Hickox' filing of a grievance, that defendant Harzbecker was deliberately indifferent to Hickox' need to be treated for rectal bleeding in February 2015, and that defendant Hewitt retaliated against Hickox for filing grievances by issuing a misconduct report against him on June 11, 2015.

Estelle v. Gamble, 429 U.S. 97, 106 (1976) and Carlson v. Green, 446 U.S. 14 (1980) hold that corrections personnel violate the Eighth Amendment when they are deliberately indifferent to an inmate's serious medical need. The subjective component of the claim was explained in Farmer v. Brennan, 511 U.S. 825, 837 (1994): deliberate indifference requires that the defendant be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and that the defendant actually drew the inference but did not respond to it. Estelle did not attempt to comprehensively define the objective component of the claim, but subsequent cases relate the concept of serious medical need to an unreasonable risk of harm to the inmate's present or future health. See e.g. Helling v. McKinney, 509 U.S. 25, 35 (1993)(environmental tobacco smoke alleged to pose

2

unreasonable risk of serious damage to inmate's future health.) In this circuit a taxonomy was set out three decades ago in Monmouth County Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir.1987). Serious medical needs are: 1) conditions diagnosed by a physician as requiring treatment or obvious to a lay person as needing a doctor's attention; 2) conditions that without treatment will inflict "unnecessary and wanton" amounts of pain; and 3) conditions that cause an inmate to suffer a life-long handicap or permanent loss.

The plaintiff's deliberate indifference claims fail, first of all, because the evidence is undisputed that there was no denial of treatment. Excerpts from Hickox' medical records submitted by defendants, the authenticity of which Hickox does not dispute and which are consistent with the exhibits Hickox submitted with his own motion for summary judgment, show that Hickox was treated for both his rectal bleeding and for his spider bite. At about 4:00 p.m. on April 20, 2015, Harzbecker examined plaintiff, confirmed a reddened area that was consistent with a spider bite, told plaintiff that she would call to see if an antibiotic would be ordered, and subsequently called in an order. At 10:41 p.m. that day, a David Burwell, M.D., approved a 7-day course of Bactrim twice a day beginning April 21 and ending April 27. The medication

3

chart indicates that Hickox received the full course of medication under the supervision of five different nurses.

On April 22, 2015, Doctor Burwell also saw Hickox in response to his complaints about rectal bleeding and prescribed a topical ointment PRN (*pro re nata*, as needed) and a laxative/stool softener, as well as a medication for an unrelated complaint of high blood pressure. Hickox had first complained about rectal bleeding in February 2015 and the medical records show that Hickox was scheduled to be seen for this complaint the next day; the defendants' records indicate, and plaintiff does not dispute, that Hickox missed his scheduled appointment in February not due to any delaying action by defendants, but due to a transfer between units in the prison and a court appointment. Hickox does not allege or point to any evidence that he made any further request for treatment or any subsequent complaints about rectal bleeding before he was seen in April. The medication chart indicates that Hickox received the full course of both the topical medication and the stool softener under the supervision of five nurses.

Hickox does not produce or point to evidence that rectal bleeding constituted a serious medical need in February 2015. Hickox also offers no evidence that being seen in April 2015 and

4

not in February or March made any difference to his treatment or to his health.

Because Hickox does not dispute that the medical records correctly reflect that he was treated for his complaints, he expressly bases his claim, see ECF no. 47, Plaintiff's Brief (unpaginated) solely on the repeated assertion that defendant Harzbecker was required to provide "immediate" treatment for his complaints. Hickox does not even assert what specific treatment should have been provided for either complaint, and since he is no medical expert he has no competent evidence that any particular treatment was necessary. Hickox fails to establish a genuine issue of fact exists as to the objective element of either claim.

As for the subjective element, Hickox offers no evidence that he had symptoms so obvious and compelling that Harzbecker or any other medical professional would have drawn the conclusion that some particular treatment other than that provided was called for. Hickox fails in his complaint or in his brief to describe his symptoms in more than vague terms. Hickox fails to establish a genuine issue of fact exists as to the subjective element of his claims.

What Hickox offers in support of his spider bite claim is that Hickox, at some point during the six hours between Hickox'

examination for his spider bite and the approval of treatment, felt ill and asked the block officer to call Harzbecker; Harzbecker relayed through the block officer that "she wasn't giving anything because the officer called and bothered her," Amended Complaint ¶19, and as a result "he was left all of this time without treatment, feeling paralyzed and ill." ECF no. 30 at 4.

What Hickox offers in support of his rectal bleeding claim is the single sentence in his brief arguing that Harzbecker can be found liable because "she was required to provide immediate triage [sic] to control the bleeding."

That Harzbecker allegedly did not do an undefined "something more" for plaintiff when he felt ill as a result of the spider bite would have significance only if that feeling, standing alone, signified a serious medical need. There is nothing to support that. There is no claim in either the original or the amended complaint that the plaintiff **needed** any medical treatment for his spider bite beyond the antibiotic, and there is no competent medical evidence in support of such a claim if one had been made.

Hickox argues that a jury could find Harzbecker liable on the spider bite claim (for what injury, it is not clear) upon proof that: 1) she yelled at the block officer that "she wasn't

6

giving anything;" and 2) she failed to re-examine a patient she had examined within the past few hours and do an undefined something else based on the patient's statement that he was "feeling ill." This is not the case.

Hickox argues that a jury could find Harzbecker liable on the rectal bleeding claim solely upon proof that: 1) he made a complaint in February 2015 and 2) he was not seen until April 2015. This is also not the case.

It is important to look up from the individual case and see the larger trend of frequent filer inmates like Hickox who make extensive use of the medical department and who cannot point to any inadequacy in that treatment. Such frequent filers file complaints alleging deliberate indifference merely on a claim of delay (meaning that treatment was not instantaneous) or the claim that the medical staff was discourteous, or was insensitive to what their symptoms "could have" indicated. This is at least the second effort by Hickox himself in this direction. <u>Hickox v. Blair County</u>, Case No. 3:11-cv-78-KRG-KAP (W.D.Pa. December 12, 2012)(defendants' failure to provide medical care "could result" in "Accute [sic] Respiratory Death Syndrome"), <u>appeal dismissed</u>, No. 12-4565 (3d Cir. February 25, 2013).

7

Applying this to plaintiff's two claims, and accepting for purposes of these motions that a spider bite presented a serious medical need, Harzbecker quite obviously responded to that need with a course of treatment plaintiff does not even criticize. Hickox' complaint later that evening that he felt "ill" added only one fact to Harzbecker's knowledge. Plaintiff does not remotely explain how "feeling ill" is a serious medical need, much less how Harzbecker, on the basis of Hickox' statement, could be found to have actually drawn the conclusion that plaintiff had an additional serious medical need that required some new treatment. And of course Hickox offers no evidence that he suffered any injury ass a result of Harzbecker not doing an indefinite "something else."

As for the rectal bleeding claim, Hickox does not point to evidence that would allow the inference that it ever constituted a serious medical need. There are not even complaints of pain from this source by Hickox, who had no shortage of complaints during this same time period, including complaints of chest pain, complaints of "constant pain" from his dental work, complaints that he needed Motrin from the medical department because the Motrin that he had to purchase in the commissary "does not work," and complaints that he needed a psychiatrist to treat his PTSD.

To sum up, plaintiff was promptly treated for his spider bite, so the claim is focused on the alleged indifference to plaintiff's feeling "ill." Lanzaro's first and second categories do not apply, because there is nothing about plaintiff's feeling ill that suggested to the defendant that plaintiff needed attention beyond what he was receiving. With respect to the rectal bleeding, although there was a lag between first complaint and first treatment, there is no evidence that Harzbecker was responsible for that lag, no evidence there was any need for any treatment during that time, and no evidence that there were complaints of any symptoms to which Harzbecker could be indifferent.

As for the third Lanzaro category, plaintiff has not alleged, much less offered evidence, that he suffers or ever suffered any residual effects from his rectal bleeding or from his spider bite, much less from the alleged deliberate indifference to his rectal bleeding or to his feeling ill while waiting for the treatment prescribed for his spider bite.

With respect to the retaliation claim against Hewitt, defendants do not argue for purposes of this motion that the first two elements of a retaliation claim exist. See Mitchell v. Horn, 318 F.3d 523, 530 (3d Cir.2003) (listing the elements for a retaliation claim); Rauser v. Horn, 241 F.3d 330, 334 (3d

9

Cir.2001)(same). I nevertheless recommend *sua sponte* grant of summary judgment based on the lack of adverse action. The only sanction referred to by either party is Hickox' description in ECF no. 47 of the consequences of the misconduct: he was moved to administrative custody for nine days pending the hearing, and then released. This is hardly the sort of sanction that would deter a reasonable inmate from protected activity, and more to the point the record indicates that Hickox himself at least once requested protective custody just to get away from "the chaos on the block." To base liability in a retaliation claim against a member of the medical staff on the length of time before the disciplinary hearing was held, a condition that is not imposed as a sanction, one that is only accidental to the disciplinary process, and one over which the medical staff has no control, would be irrational. As for Hickox' theory that the denial of medical care to him was also retaliatory, the record is replete with visits to medical unit by Hickox and for the reasons described above there is no plausible evidence that Hickox was denied care by defendants.

Turning to the third element of a retaliation claim, that Hickox' protected activity caused some adverse action by Hewitt, in the absence of some evidence of causation a plaintiff has no viable claim of retaliation against a defendant. It is therefore

10

important in analyzing causation to focus on what the alleged protected conduct is.

The evidence is not disputed that Hewitt filed a misconduct against Hickox for interfering with her treatment of Hickox' cellmate on June 11, 2015, and that Hickox filed a grievance (referring to the misconduct, and also to this lawsuit) on June 12, 2015. It stands to reason that Hickox' grievance did not cause Hewitt' issuance of a misconduct on the previous day.

Hickox, in his brief in opposition to the defendants' motion for summary judgment, ECF no. 47, therefore turns to the assertion that the misconduct was nevertheless retaliation for Hickox giving legal assistance to other inmates. He provides no evidence about what this legal assistance was, much less that Hewitt knew about it, much less that she was motivated by it and not by Hickox' actions on June 11 to write the misconduct on June 11.

In the misconduct and in her notes written at the time the misconduct was issued, Hewitt refers to Hickox standing in a position to overhear her conversation with Hickox' cellmate, Hickox repeatedly asking why the inmates were locked in, and Hickox stating "let me chalk this one up for the lawsuit." Hewitt also notes that Hickox on other occasions repeatedly threatens to file

11

suit when he interacts with medical staff and that Hickox asks other inmates to provide Hickox with material Hickox can use in his lawsuits. Hickox contends that this surplus language is the smoking gun that proves his retaliation claim

None of what Hewitt described is protected conduct. Hewitt did not refer to the exercise of Hickox' own First Amendment rights, nor to aid by Hickox to others in the exercise of their rights. Hickox asserts that he did undertake protected activity, but to get to a jury Hickox must do more at the summary judgment stage than repeat the allegations of his complaint, and he has not shown any evidence that some event other than the events of June 11, 2015 caused the misconduct on June 11, 2015. To the contrary, in Hickox's brief in opposition, ECF no. 47, Hickox asserts that Hewitt issued the misconduct "in anger" because Hickox "was assisting others and voicing his opinion in a protected way," "bottom line" has the right to free speech as long as he is not causing any type of disturbance or creating a security concern, and the disciplinary committee "felt the same way" because they found him not guilty of the misconduct. In other words, Hickox agrees that the motivation for the misconduct was Hewitt's irritation at Hickox' actions on June 11, 2015.

Now, it must be admitted that if Hickox, by talking during Hewitt's examination of the other inmate, was undertaking protected conduct on June 11, 2015, then there might be an issue of fact that Hewitt's conduct was retaliatory. However, Hickox' assertion that he has the right to say whatever he wants while Hewitt conducted her examination so long as he is not creating a disturbance is simply not the law. Wilson v. Schillinger, 761 F.2d 921, 925 (3d Cir.1985) correctly states the law:

Specifically, prisoners' exercise of First Amendment freedoms may be curtailed when, in the informed judgment of prison officials, such exercise poses "the likelihood of disruption to prison order or stability, or otherwise interferes with the legitimate penological objectives of the prison environment." Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119, 132, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977).

In other words, Hewitt or any other prison staff member, could have issued Hickox a misconduct on June 11, 2015, based on a judgment, even an erroneous one, that Hickox' conduct in "voicing his opinion in a protected way" was interfering with her examination.

It is an open question, meaning that the Supreme Court has not said anything relevant in the four decades since Jones, to what extent an inmate's right to receive legal assistance implies some right on the part of another inmate to provide it. Certainly the lack of authoritative precedent about the legal protection Hickox could claim for jailhouse lawyering means that even if

13

Hewitt intended her misconduct as a sanction against Hickox for his alleged help to an inmate in filing a grievance against Harzbecker and not as a response to Hickox' conduct on June 11, 2015, Hewitt might well be protected by qualified immunity. But because of the lack of evidence it is not even necessary to discuss qualified immunity.

As I have noted before retaliation claims have come to be the tail that wags the dog for frequent filers. Although the defendants do not rely on it, I will briefly discuss the timing of Hickox' pleadings as a clear illustration of this phenomenon. Hickox' retaliation claim began as three paragraphs in his original complaint dated June 6, 2015. Paragraphs 31-33 contain only a conclusory statement of an intent to make a retaliation claim based on "the issuance of a falsified misconduct [or] the denial of medication or medical care." The only factual elaboration is in paragraph 21, where Hickox alleges that on unspecified dates Hewitt filed falsified grievance reports (plural) against Hickox **and** denied him unspecified treatment because at some unstated time Hickox aided an unnamed inmate in filing a grievance (singular) against Harzbecker. In Hickox' amended complaint, filed on July 7, 2015, Hickox repeats paragraph 21 verbatim. In paragraph 39, his

14

claim of retaliation becomes "Hewitt retaliated by issuing the Plaintiff a falsified misconduct report."

Since the motivation for the alleged retaliation remained the same but the retaliatory conduct changed, what happened between June 6, 2015 and July 7, 2015? What happened was the examination of Hickox' cellmate on June 11, 2015, Hickox' exercise of what he believes is an absolute right to free speech, and Hewitt's writing of the misconduct. Unless one takes a Humpty-Dumpty approach to causation it would be more reasonable to conclude that Hickox made the claim in his complaint and then went looking to provoke the misconduct from Hewitt to justify it than it would be to conclude that Hewitt was somehow motivated to write the misconduct by a grievance that Hickox allegedly helped some inmate file against Harzbecker and not on her belief that Hickox was disruptive on June 11, 2015. But whichever initial position one finds more plausible it is Hickox' burden to show that a factfinder could, based on the evidence, conclude that the protected activity Hickox alleged actually caused Hewitt to write the misconduct. Since there is no such evidence, summary judgment must be entered for the defendant.

Pursuant to 28 U.S.C.§ 636(b)(1), the parties are given notice that they have fourteen days to file written objections to this Report and Recommendation.

DATE: 3 January 2017

Keith A. Pesto,
United States Magistrate Judge

Notice to counsel of record by ECF and by U.S. Mail to:

Justin Hickox MD-0067
S.C.I. Benner
301 Institution Drive
Bellefonte, PA 16823